[Crim. No. 17644. In Bank. July 5, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
SIDNEY LEROY STRICKLAND, Defendant and Appellant.

950

**COUNSEL**

Charles A. Harrison, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James and Daniel J. Kremer, Assistant Attorneys General, A. Wells Petersen and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

McCOMB, J.—Defendant, charged with murder, was, after a jury trial, found guilty of voluntary manslaughter. A hearing was granted by this court after decision by the Court of Appeal, Fourth Appellate District, Division Two, for the purpose of giving further study to the issues involved, particularly the problem of whether the trial court correctly determined that section 12022.5 of the Penal Code, requiring additional punishment for a defendant convicted of certain enumerated felonies if he used a firearm in the commission of the offense, was applicable to defendant.

After such study, we have concluded that the opinion of the Court of Appeal, prepared by Mr. Justice Gabbert, correctly treats and disposes of most of the issues involved, but that although, as the Court of Appeal concluded, the trial court incorrectly ruled that section 12022.5 of the Penal Code was applicable, defendant is subject to additional penalty under section 12022 of the Penal Code, since he committed the offense while armed with a deadly weapon within the meaning of that section.

Accordingly, with certain changes, the opinion of the Court of Appeal is adopted as and for the opinion of this court. Such opinion (with appropriate deletions and additions as indicated)* is as follows:

[Defendant], prosecuted for the murder of George "Bubba" Brooks, timely appeals after his conviction, by jury verdict, of the lesser included offense of voluntary manslaughter. As we view them, defendant['s] [ ] principal contentions are: (1) judicial error in admitting into evidence a tape of witness Ben Ward's statements to the police; (2) prosecutorial misconduct prejudicially compounded by ineffective aid from defense counsel; (3) erroneous instructions on both second degree murder and conviction for the lesser included offenses of murder; plus (4) improper application of Penal Code section 12022.5, a sentencing statute.

An appellate court must view the evidence in a light most favorable to the respondent, presuming in support of the judgment the existence of every fact which can reasonably be deduced from the evidence. (*People* v. *Mosher,* 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) Applying this stricture, it appears Bubba Brooks, a long-time friend of defendant, reached an agreement with defendant and Rosanna Smith, defendant's "common law" wife, whereby he (Bubba) would pay her $40 per month room and board for the right to live at her home in Riverside, California. Pursuant to that agreement, Bubba moved in on Friday, May 5, 1972. Two days later, around 11 p.m., Bubba was there shot in the head and killed.

Circumstances had Bubba living alone in the house his first days as a boarder. On Saturday, May 6, 1972, while Bubba stayed in Riverside, defendant went to Los Angeles for the weekend in company with Ben Ward and two women. In Los Angeles this group met Karen Harris, who on Sunday returned with them to Riverside. When the five arrived in Riverside about 10:30 p.m., the two women were dropped off, and defendant, Ben Ward and Karen Harris continued on to [defendant's] home. They reached the house about 11 p.m.; quickly they discovered that the front door had been left open.

The homicide occurred shortly after defendant and his two companions entered the darkened house. [Defendant], fearful he had been "ripped off," checked to see if his stereo and television had been taken. Then, observing

---

*Brackets together, in this manner [ ], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*People* v. *Cantrell,* 8 Cal.3d 672, 677 [105 Cal.Rptr. 792, 504 P.2d 1256].)

that nothing had been stolen, he proceeded to the master bedroom and found Bubba stretched out diagonally on his (defendant's) waterbed. (Rosanna Smith, defendant's wife, was away for the weekend.) Deeply annoyed at Bubba, [defendant] uttered an obscenity, rebuked Bubba for not securing the house, and followed through by kicking the motionless Bubba. Karen Harris observed this conduct, testifying that as she peeked into the dimly lighted bedroom she could see Bubba lying on the waterbed with one arm at his side and another across his chest; she did not remember seeing any blood. To avoid involvement in a confrontation, Karen and Ben exited the house and smoked cigarettes in a car parked in front of the house. Shortly thereafter, Karen heard [defendant] "talking loud"; she then heard a shot from a direction "towards the house."

[Defendant's] cover-up effort began as Karen and Ben re-entered the house. Defendant, standing at the foot of the waterbed and holding a gun, exclaimed: "Oh, man, Bubba is dead." He followed this by pointing to another gun—a sawed-off .22 pistol—and saying: "Bubba ha[s] been shot with that gun." [Defendant] then less than subtly indicated that should the police have questions, Karen and Ben should state Bubba was already dead when the three returned from Los Angeles. With this as preface, [defendant] enlisted the cooperation of Karen and Ben to dispose of the body and clean up the bedroom. Karen testified that, on this (her) second observation of Bubba, his arms had changed position, being held down at his sides. She noticed lots of blood on the bed and sheets. The foregoing paragraphs, designed to limn briefly the most pertinent facts, will be supplemented as necessary when specific issue discussions so require.

## I

### The Tape Recording of Ward's Statement to the Police was Properly Admitted

Defendant [ ] contends the court erred in admitting into evidence, for the truth of its contents, a tape recording of Ben Ward's statements to the police. Specifically, defendant argues the prosecution did not comply with the foundational requirements of Evidence Code section 770.

The controversial tape was played for the jury after prosecution witness Ben Ward had completed his testimony at trial. This taped conversation (between the police and Ward) had Ward declaring that, while outside [defendant's] house, he had heard defendant "raising his voice" against Bubba. Also, the tape contained Ward's statement that, upon re-entering the house, he could smell the odor from a recent gunshot. Altogether, the

tape flatly contradicted Ward's trial testimony, where Ward supported [defendant's] contention that Bubba was already dead when he (defendant) entered the house.

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770, which gives alternative foundational requirements, reads: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

The above sections, in effect, permit a prior inconsistent statement of a witness to be admitted not only to impeach his credibility, but also to prove the truth of the matters therein asserted. (*People* v. *Green,* 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].) Moreover these sections, contrary to defendant's assertions, amply preserve the right to confrontation guaranteed by the Sixth Amendment. (*California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Green, supra,* 3 Cal.3d 981, 989-991.)

In the instant case, the record clearly reveals that the prosecution, in its direct examination of Ward, challenged his in-court testimony by making direct reference to Ward's earlier, and tape-recorded, statements to the police. On the stand, responding to such references, Ward denied telling the police that he and Karen left [defendant's] house, denied saying that, upon re-entering the house, he could smell the aroma from a freshly fired gun, and further denied that defendant had suggested he (Ward) claim, if questioned, that Bubba's death had preceded the return from Los Angeles. Prosecution interrogation thus, we conclude, satisfied the Evidence Code section 770 requirement that a witness, while testifying, be given an opportunity to explain or deny past inconsistent statements. The fact this opportunity occurred prior to the actual playing of the tape is without significance. (See *People* v. *Johnson,* 68 Cal.2d 646, 650 [68 Cal.Rptr. 599, 441 P.2d 111]; *People* v. *Petersen,* 23 Cal.App.3d 883, 889 [100 Cal.Rptr. 590].)

## II

### THE RECORD SHOWS NEITHER PROSECUTORIAL MISCONDUCT NOR INADEQUACY OF DEFENSE COUNSEL

Defendant [ ] next catalogues numerous instances of alleged prosecutorial misconduct, asserting each to have been so prejudicial as to warrant reversal of his conviction. We note that no objection was made at the trial nor any admonition requested. ■ As indicated in *People* v. *Mitchell,* 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211], "[M]isconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it."

■ Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People* v. *Asta,* 251 Cal.App.2d 64, 86-87 [59 Cal.Rptr. 206].) The ultimate question to be decided is, had the prosecutor refrained from the misconduct, is it reasonably probable that a result more favorable to the defendant would have occurred. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243].)

Defendant initially argues the prosecutor failed to adequately consider the reliability and admissibility of the testimonies of Karen Harris and Ben Ward. ■ Defendant contends Karen Harris should have been subjected to a polygraph examination before being permitted to testify. He cites no authority for this proposition, nor is there any. ■ Also, and without any basis in the record, defendant argues the prosecutor, had he checked, would have found that the trial testimony of Karen Harris and the taped statements of Ben Ward were products of coercion. We cannot discuss such contentions on direct appeal, our jurisdiction being limited to matters presented by the record. (*People* v. *Merriam,* 66 Cal.2d 390, 397 [58 Cal. Rptr. 1, 426 P.2d 161].)

[Defendant] next urges that the prosecutor committed prejudicial misconduct by misstating the nature of the wound inflicted on Bubba. ■ Particularly, defendant points to the prosecutor's opening argument wherein he stated: "[T]he testimony from the pathologist will be that it wasn't a contact wound, it was not a wound where the gun would be held up to the head very close, but was a wound that would be inflicted from a distance of a few feet or more, in other words, ruling out a suicide." Thereafter, in closing argument to the jury, the prosecutor noted: "[I]t wasn't a contact wound. By that I mean right up to the head with powder

burns, so that this was from some distance, so you know it wasn't a suicide like [defendant] had originally hoped for or thought of." Defendant asserts these prosecutorial statements constitute reversible error since the pathologist, while testifying, admitted he could not determine the distance from which the wound was inflicted, except to the extent of saying it was not a contact wound.

Prosecutorial argument concerning the wound did not constitute error. It is true the pathologist never specified the distance away from the head a gun must be held in order to avoid producing a contact wound. Nevertheless, we feel the prosecutor could reasonably infer—and argue—that the absence of powder burns precluded suicide. Certainly, in view of other evidence suggesting defendant's guilt, it cannot persuasively be argued the prosecutor's inference was a deliberate attempt to deceive the jury.

■ [Defendant] also argues the prosecutor misstated the evidence concerning shots and the onset of rigor mortis. Since Karen Harris expressly testified she heard a "shot" from a direction "towards the house," the prosecutor could permissibly have stated the shot came from "inside the house." This inference is further supported by Ben Ward's taped testimony he smelled gun powder in the house after he and Karen returned from the car. As to rigor mortis, the prosecutor amply followed up his opening statement that, based on the time of that phenomenon, Bubba's death could be fixed at 11 p.m. on May 7, 1972. At that time, of course, defendant had returned from Los Angeles.

Altogether, analysis of alleged instances of prosecutorial misconduct inexorably leads to the conclusion that no such misconduct occurred. Given the strength of the case against defendant, the alleged misconduct would not have been prejudicial even if it were error. (See *People* v. *Brajevich*, 174 Cal.App.2d 438, 447 [344 P.2d 815].)

■ [D]efendant [raises] for the first time on appeal [a contention] that his counsel at trial was inadequate. [ ]

[D]efendant [ ] has the burden of establishing—as a demonstrable reality—evidence of his attorney's lack of diligence. (*People* v. *Meneley,* 29 Cal. App.3d 41, 57 [105 Cal.Rptr. 432].) Such evidence must indicate his trial was reduced to a "farce and a sham." (*People* v. *Ibarra,* 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].)

Defendant's charges of trial counsel incompetence are contained in a discussion unsupplemented by citation to case law. Among other things, defendant alleges his counsel consulted with him (defendant) less than two hours, that his counsel failed to present evidence of a test administered

by a criminologist for the purpose of determining whether he (defendant) had fired a gun, that his counsel failed to introduce a polygraph test given to Ben Ward, and that cross-examination of prosecution witnesses Ward and Harris should have been more aggressive. ■ These assignments of incompetence all rely on or refer to matters outside the appellate record, and consequently they cannot be considered on appeal. (*People* v. *Sakelaris,* 151 Cal.App.2d 758 [312 P.2d 263].) Moreover, these allegations are made without any specific explanation of how alternative courses of defense counsel conduct would have been more favorable to defendant [ ].

■ In addition, defendant offers from the record many examples of defense counsel "incompetency." He argues his counsel should have moved pursuant to Penal Code section 995, to ensure admissibility at the trial of Karen Harris' preliminary hearing testimony. He contends his counsel, acting "incredibly," withdrew a motion for discovery and that the counsel failed to move for a new trial. Defendant neglects to disclose, however, the manner in which he was prejudiced by such actions, especially since Karen Harris' preliminary hearing testimony was consistent with her testimony at trial and since, inter alia, defendant fails to show what newly discovered evidence would have formed the basis for a new trial motion.

This court concludes defendant has not satisfied his burden of showing a lack of diligence (on the part of defense counsel) sufficient to reduce the trial to a farce and a sham. On the contrary, the record shows defendant's counsel to have been reasonably vigorous. He (defendant's counsel) ably served defendant's interests in the courtroom.

## III

### INSTRUCTIONS TO THE JURY ARE FREE
### OF REVERSIBLE ERROR

Defendant [ ] next urges the trial court committed reversible error in its instructions to the jury. Such allegations lack merit.

Defendant first argues the second degree murder instruction relating to intent was improper. He notes the trial court gave both CALJIC Nos. 8.30[1] and 8.31.[2] He then maintains that second degree murder under

---

[1]CALJIC No. 8.30, as given at trial, reads: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation."

[2]CALJIC No. 8.31, as given at trial, reads: "Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an act

CALJIC No. 8.30 requires an *intent to kill whereas that crime*, under CALJIC No. 8.31, requires no such intent if the act which caused death was highly dangerous to life. Defendant concludes by observing that the latter instruction impermissibly placed a lesser burden on the prosecution, obviating the intent requirement of the first instruction.

■ This court need not decide whether it was error to give both instructions in this case. Since defendant was convicted of the lesser offense of voluntary manslaughter, any possible error in the second degree murder instructions would not have influenced the outcome of the case. Thus, the (arguable) error of giving both CALJIC Nos. 8.30 and 8.31 was not prejudicial. (*People* v. *Watson, supra,* 46 Cal.2d 818, 835.)

Defendant['s] [ ] second assignment of error is highly confusing. He urges the trial court erred in instructing that the jury could find defendant guilty of such lesser included offenses of murder as voluntary manslaughter and involuntary manslaughter. At the same time, he concedes, in his brief, that voluntary manslaughter would have been an appropriate charge. ■ This court concurs in defendant's concession and notes, in light of the varying interpretations which reasonably could be given to the evidence, that instructions on murder and its included offenses were proper.

■ Defendant finally argues it was reversible error for the trial court to neglect to instruct *sua sponte* that witnesses Karen Harris and Ben Ward were accomplices whose testimony required corroboration. This argument must fail because, under Penal Code section 1111, an accomplice. is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." As no evidence was adduced at trial to show that either Karen Harris or Ben Ward joined with defendant in the killing of Bubba, neither one of them is an accomplice under Penal Code section 1111. ■ It is well established that mere presence near the scene of a crime cannot, in itself, make a person an accomplice. (*People* v. *Villa,* 156 Cal.App.2d 128, 134 [318 P.2d 828].)

---

involving a high degree of probability that it will result in death, which act·is done for a base, antisocial purpose and with·wanton disregard for human life.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

## IV

## PENAL CODE SECTION 12022.5 WAS
## IMPROPERLY APPLIED IN THIS CASE

[ ] [Defendant correctly contends that section 12022.5 of the Penal Code was improperly applied in this case. That section reads, in pertinent part, as follows: "Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, rape, burglary, or kidnaping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the state prison for a period of not less than five years. Such additional period of imprisonment shall commence upon expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence."

 [Section 12022.5 of the Penal Code applies only with respect to the six felonies specifically enumerated therein. (*People* v. *Provencher,* 33 Cal.App.3d 546, 548-549 [108 Cal.Rptr. 792].) It was enacted after this court decided that section 12022 of the Penal Code, which provides for an additional period of imprisonment upon conviction of a felony while armed with a deadly weapon, does not apply where a deadly weapon is an essential element of the basic crime. (See, e.g., *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862]; *In re Shull,* 23 Cal.2d 745 [146 P.2d 417].) In an evident attempt to overcome such objection, the Legislature enacted section 12022.5 specifying six particular felonies, making the additional penalty prescribed therein applicable to the "use" of a firearm (rather than "while armed with any deadly weapon") in the commission, or attempted commission, of such felonies, and providing that the section "shall apply even in those cases where the use of a weapon is an element of the offense." As pointed out in *People* v. *McDaniels,* 25 Cal.App.3d 708, 715 [102 Cal.Rptr. 444], the Legislature could have amended the particular Penal Code sections which fix the penalties for the six specific felonies, but it elected, instead, to accomplish its purpose by adopting section 12022.5.

· [*Provencher* dealt with a situation analogous to that existing here. The defendant there had been charged with, and found guilty of, assault with intent to murder; and it was found that he had used a firearm in the commission of the offense. In answering the People's argument that assault with intent to murder included the same elements as attempted murder and that the statute should therefore apply, the Court of Appeal stated at page 549 of 33 Cal.App.3d: "Although the elements of attempted

murder (intent and direct but ineffectual acts in furtherance) may be present in an assault with intent to murder, the offenses are not identical. [Citations.] The Legislature has established these two separate crimes, with two separate punishments. If it had wished to include assault with intent to murder in section 12022.5, it could have done so.

["It should be noted that assault with intent to murder carries a lesser maximum penalty than any offense listed in section 12022.5, other than a conviction of attempted second degree burglary. Attempted murder carries a maximum sentence of twenty years. Assault with a deadly weapon carries a maximum sentence of life. Assault with intent to murder carries a maximum sentence of fourteen years, so that it is rational for the Legislature to have excluded it from the listed crimes."

[Under the statutory definition, murder is "the unlawful killing of a human being, *with malice aforethought*." (Italics added; Pen. Code, § 187.) Manslaughter, on the other hand, is "the unlawful killing of a human being, *without malice*" (italics added; Pen. Code, § 192); and voluntary manslaughter is such a killing committed "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. 1). Significantly, a showing that the offense was committed upon a sudden quarrel or in the heat of passion, although important in determining whether an unlawful killing constitutes murder or manslaughter, is otherwise irrelevant with respect to any of the crimes specifically enumerated in section 12022.5 of the Penal Code and would have no bearing on the punishment of a defendant found guilty of any such crimes. Manslaughter, while a lesser included offense of murder, is clearly a separate offense (*People* v. *Moles,* 10 Cal.App.3d 611, 615 (2a) [89 Cal.Rptr. 226]) and carries a substantially lesser maximum punishment than murder, the maximum punishment for murder being life imprisonment or under certain circumstances death (Pen. Code, §§ 190, 190.2), while the maximum punishment for manslaughter is imprisonment in the state prison for not exceeding 15 years (Pen. Code, § 193). Manslaughter, in fact, "carries a lesser maximum penalty than any offense listed in section 12022.5, other than a conviction of attempted second degree burglary." ▮ Under all the circumstances, it is logical to assume that, even though manslaughter is a lesser included offense of murder, the Legislature did not intend to make the provisions of section 12022.5 of the Penal Code applicable to it. To the extent that *People* v. *Otis,* 33 Cal.App.3d 893 [109 Cal.Rptr. 444], is contrary to the views expressed herein, it is disapproved.

[In reaching this conclusion, we are mindful of our admonition in *Keeler* v. *Superior Court,* 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617, 40

A.L.R.3d 420], where we said at page 631 (7): "It is the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit; just as in the case of a question of fact, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute." In *Keeler,* we concluded that the Legislature, in adopting the definition of murder in section 187 of the Penal Code, intended to exclude from its operation the act of killing an unborn fetus.

[Although section 12022.5 of the Penal Code was improperly applied to defendant, he is, nevertheless, subject to additional punishment under section 12022 of the Penal Code because of his having been armed with a deadly weapon at the time he committed the crime of voluntary manslaughter, a felony.[3] Thus, the following statement from *Provencher* is apropos: "The jury . . . found that appellant 'did use a firearm' in the commission of the offense. Penal Code section 12022.5 and section 12022 [fn. omitted] do not define a crime or offense but relate to the penalty to be imposed under certain circumstances. Thus section 12022 is not a lesser included offense under 12022.5 but section 12022 would be applicable in any case in which 12022.5 applies. Basically 12022.5 is a limited application of section 12022 with a heavier penalty. In the present case appellant did not come within the provisions of section 12022.5, as the crime of which he was convicted was not specified in that section, but the jury did find that he used and thus was armed with a firearm, a shotgun, at the time the offense was committed. Appellant was charged in the commission with the use of a firearm under section 12022.5, thus had notice that his conduct [could] also be in violation of section 12022."]

---

[3][Section 12022 reads, in part: "Any person who commits or attempts to commit any felony within this state while armed with any of the deadly weapons, as defined by subdivision (f) of Section 3024, upon conviction of such felony or of an attempt to commit such felony, shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment in a state prison for not less than five nor more than 10 years. Such additional period of imprisonment shall commence upon the expiration or other termination of the sentence imposed for the crime of which he is convicted and shall not run concurrently with such sentence."

[It will be noted that section 12022 prescribes both a minimum and a maximum term for the additional period of imprisonment. Section 12022.5, on the other hand, prescribes only a minimum. Accordingly, under section 671 of the Penal Code persons sentenced under section 12022.5 are subject to terms of life imprisonment.]

## V

### MISCELLANEOUS CONTENTIONS

Defendant['s] [ ] remaining allegations of error lack substance. In each instance, he has chosen to argue error without a single reference to case authority.

■ Defendant contends, among other reasons, that he was denied a fair trial because the jury panel, assertedly drawn from a list of registered voters, systematically excluded blacks and Spanish-surname citizens. In addition, he complains the trial jury was "inherently incompetent," arguing that, since he is black, the all white jury selected in his case may not reasonably be viewed as a jury of his peers.

The above objections concerning the jury panel and the trial jury are broached for the first time on appeal. Since there is nothing in the record to suggest the racial makeup or manner of selection of either group, defendant's contentions are not properly subject to review. (*People* v. *Gardner,* 71 Cal.2d 843, 854-855 [79 Cal.Rptr. 743, 457 P.2d 575].) Even if a factually accurate record were before this court, defendant would still not prevail. Penal Code section 1060 clearly provides: "A challenge to the panel must be taken *before* a juror is sworn . . . ." (Italics added.) As to the trial jury, the case of *Swain* v. *Alabama,* 380 U.S. 202, 203 [13 L.Ed.2d 759, 763, 85 S.Ct. 824] states unambiguously that "a Negro defendant is not entitled to a jury containing members of his race . . . ."

■ Defendant also contends, on the basis of incidents outside the record, that he was the victim of a "biased and unidirectional police investigation." This argument is untenable since there exists no basis in law or logic to fault a police investigation merely because it quickly focuses in on a particular suspect.

■ Finally, defendant argues his conviction is unsupported by substantial evidence. Since prosecution witnesses Ward and Harris saw defendant [ ] holding a gun over the dead Bubba about the time fixed as the time of death by the pathologist, and since these witnesses either heard a shot (Harris) or smelled gunpowder in the house (Ward), it would be absurd to accept defendant's argument. This court therefore finds that defendant's conviction was supported by substantial evidence.

The judgment is affirmed, with the exception that defendant's sentence is modified to delete punishment imposed under Penal Code section 12022.5 [and to add punishment imposed under Penal Code section 12022].

Wright, C. J., Tobriner, J., Mosk, J., and Burke, J., concurred.